UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CHRISTOPHER CONWELL,<br><br>      Petitioner,<br><br>      v.<br><br>WARDEN,<br><br>      Respondent. | CAUSE NO.: 3:20-CV-660-MGG |

OPINION AND ORDER

Christopher Conwell, a prisoner without a lawyer, filed a habeas corpus petition challenging his 2010 conviction in Marion County for murder and carrying a handgun without a license under cause number 49G02-0812-MR-295890. (ECF 1.) For the reasons stated below, the petition is denied.

I.    BACKGROUND

In deciding the petition, the court must presume the facts set forth by the state courts are correct unless Mr. Conwell rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals set forth the facts underlying Mr. Conwell's conviction as follows:

> In December 2008, Jazy Williams drove Conwell, her former boyfriend, to Indianapolis from Fort Wayne. Jazy dropped Conwell off at a residence that was occupied by Avery Elzy and Michael Hunt. Conwell had met Elzy in an online chat room.
>
> At some point during the visit, Conwell displayed a handgun to Tory Parker, an acquaintance, who was also at the residence. The gun appeared to be a black .38 revolver with no hammer. Parker also noticed that Conwell had a tattoo on his left hand, with the word "Goon" on it.

Conwell told Parker that he was a member of a gang in Fort Wayne called the "Goons."

On Christmas day, Elzy invited approximately twenty people over to the house for a party. They all drank alcohol and smoked marijuana. By 11:30 p.m., everyone had left the residence, except for Elzy, Hunt, and Conwell. Sometime after midnight, Conwell called Jazy and asked for directions from Elzy's house to Fort Wayne. Conwell told Jazy that he had recently purchased a car and did not need a ride back.

The next morning, Elzy's mother called Elzy's cell phone, but got no answer. At approximately noon, Parker drove by Elzy's house and noticed that the garage door was open, which he thought was unusual. After discovering that Elzy's blue Sable automobile was not in the driveway, Parker called the police.

Later that afternoon, Officer Robert Carver of the Indianapolis Metropolitan Police Department (IMPD) went to Elzy's residence in response to a missing persons' report. Officer Carver opened the front door to the residence and noticed a trail of blood in the hallway. He followed the trail and discovered a dead pit bull in one of the rooms.

Officer Carver then found the bodies of Elzy and Hunt in a bedroom. Hunt had been shot twice in the head, and it was determined that one of the shots had been fired into his temple from eighteen to twenty-four inches away. The other shot was fired while the gun was held against Hunt's head. Elzy died from a single gunshot to the back of the head. It was determined that five .38 caliber bullets had been fired from the same gun.

An investigation revealed that Elzy's two cell phones were missing. As a result, the police department attempted to track those phones. Additionally, Donty Settles—Parker's friend who also attended the Christmas party—began calling one of Elzy's numbers. At some point, an individual by the name of Superior McNare, who lived in Fort Wayne, answered the phone. During the conversation, McNare told Settles that she found a purse and a cell phone in an alley near her house on December 26. The Fort Wayne Police Department was contacted, and officers recovered both items.

Thereafter, Detective Tom Tudor, of the Indianapolis Police Department, retrieved the purse and cell phone from Fort Wayne police. Elzy's Indiana

2

driver's license and various documents with her name on it were found in the purse. The cell phone contained several photographs of Elzy, pictures of the blue Sable automobile, and a video of Hunt, Settles, and Conwell.

The police obtained a court order regarding Elzy's other cell phone number, and it was determined that numerous calls were made to and from a number to an individual in Marion, by the name of Wesley Williams. When one of the detectives dialed the number on the morning of December 27, Williams answered and told the detective that Jazy was his daughter and that she used that number on his cell account. Jazy stated that she knew Conwell and that he had a tattoo on his left hand that said, "Goon."

The investigation revealed that Conwell had driven to Kandice Wade's Fort Wayne residence in a blue car, shortly after Christmas. Conwell told Wade that he had just purchased the vehicle. Wade also noticed that Conwell had a blue bag. She looked inside and saw a small, black, "western-type" handgun. Wade was very frightened, so she tossed the gun in a nearby alley. The purse and cell phone had been discovered approximately three blocks from Wade's residence.

It was determined that one of the telephones belonging to Elzy had been used to call Jazy at 12:14 a.m., on December 26. Detective Todd Lappin discerned from the locations of the cell phone towers that successive calls had been made on Interstate 69 and moving toward Fort Wayne.

On the morning of December 31, two detectives went to Jazy's residence after receiving a "ping" from Elzy's missing cell phone. Jazy was enrolled at Indiana Purdue University in Fort Wayne and lived in a student apartment. Sometime in 2008, Conwell had broken out the windows of Jazy's vehicle. As a result, the campus police conducted an investigation and warned Conwell that he was not permitted on any university property, including Jazy's apartment.

An arrest warrant had been issued for Conwell, and when the officers arrived at Jazy's apartment, she gave them consent to search. When the officers entered, they encountered Qualin Starks on a couch in the common area of the apartment. Starks identified Conwell from a photograph that the officers showed to him. He then directed the police officers to a back bedroom in the apartment. Conwell was found in the bedroom and arrested.

> Conwell was then transported to Indianapolis at Detective Tudor's request. Detective Tudor advised Conwell of the *Miranda* warnings, asked Conwell if he understood those rights, and directed Conwell to place his initial on the form as Detective Tudor read the rights aloud to him.
>
> Conwell acknowledged that he was waiving his rights and provided a statement to Detective Tudor. Although Conwell initially denied his involvement in the murders, he eventually admitted shooting both Hunt and Elzy. Conwell stated that he shot both of the victims in the head. Conwell also acknowledged that he had telephoned Jazy for directions back to Fort Wayne.
>
> Conwell was charged with two counts of murder and one count of carrying a handgun without a license. . . .
>
> On March 16, 2010, Conwell moved to suppress the post-arrest statement. Conwell argued that his statement was not admissible because it was "obtained pursuant to the warrantless entry into a private apartment and bedroom." Following a hearing, the trial court denied Conwell's motion to suppress on June 9, 2010. The trial court found that the police officers had a valid arrest warrant for Conwell when they entered Jazy's apartment. It was determined that Detective Tudor's verbal confirmation to one of the officers that a valid arrest warrant had been issued was sufficient to make the arrest. The trial court also ruled that even if an arrest warrant had not been issued, the evidence demonstrated that Jazy consented to the search of the apartment. Finally, it was determined that Conwell's statements should not be excluded as "fruit of the poisonous tree" because they were made "outside the premises, while in lawful custody from a probable cause arrest."

*Conwell v. State*, 946 N.E.2d 656 (Table), 2011 WL 1565909, at *1-*3 (Ind. App. Ct. 2011) (internal citations omitted). Following a four-day jury trial, he was found guilty as charged. *Id.* at *3. The court sentenced him to an aggregate 110-year prison term. *Id.*

On direct appeal, Mr. Conwell argued the trial court erred under Indiana law in admitting his post-arrest statement, and erred in failing to redact certain comments Detective Tudor made during the interrogation when his post-arrest statement was

4

introduced into evidence. *Id.* at *4-*6. The Indiana Court of Appeals rejected these arguments and affirmed Mr. Conwell's conviction in all respects. *Id.* at *7. He filed a petition to transfer to the Indiana Supreme Court, asserting only his claim about the redactions to his post-arrest statement. (ECF 10-7 at 2.) On June 22, 2011, the Indiana Supreme Court denied transfer. *Conwell v. State*, 950 N.E.2d 1213 (Table) (Ind. 2011). He did not seek review in the U.S. Supreme Court. (ECF 1 at 1.)

On December 27, 2011, he filed a state post-conviction petition. (ECF 10-8 at 11.) On December 21, 2016, the petition was dismissed without prejudice after Mr. Conwell filed a motion seeking an "indefinite" extension of time. (*Id.* at 14.) On January 20, 2017, Mr. Conwell filed a second state post-conviction petition. (*Id.* at 16.) On March 15, 2019, the petition was denied. (*Id.* at 24.) On April 24, 2019, Mr. Conwell filed a "motion to correct error," which the court denied the following day. (*Id.*) On September 19, 2019, Mr. Conwell filed a belated notice of appeal. (ECF 10-9 at 1.) On January 24, 2020, the Indiana Court of Appeals dismissed the appeal as untimely. (*Id.* at 3.)

On July 21, 2020, Mr. Conwell tendered his federal petition to prison officials for mailing. (ECF 1 at 5.) Liberally construing his petition, he asserts that his post-arrest statement should have been suppressed because his arrest was unlawful under the Fourth Amendment. (*Id.* at 3.) The respondent argues that the petition is untimely and, alternatively, that Mr. Conwell's claim is not cognizable in this proceeding or is procedurally defaulted. (ECF 10.) Mr. Conwell was granted until December 28, 2020, to

5

file a traverse in support of his petition. (ECF 9.) That deadline passed more than 90 days ago and no traverse has been filed.

II.   ANALYSIS

   A.   Timeliness

Mr. Conwell's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which contains a strict statute of limitations, set forth as follows:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
>> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

On direct appeal, the Indiana Supreme Court denied transfer on June 22, 2011. Mr. Conwell did not seek review in the U.S. Supreme Court, and his conviction became final for purposes of AEDPA on September 20, 2011, when the time for seeking such review expired. *Lawrence v. Florida*, 549 U.S. 327, 333 (2007); *Clay v. United States*, 537 U.S. 522, 532 (2003). As of that date, the one-year clock began running, and it continued to run for 98 days until December 27, 2011, when Mr. Conwell filed his first state post-conviction petition. 28 U.S.C. § 2244(d)(2). The federal deadline was tolled until December 21, 2016, when the court dismissed his post-conviction petition without prejudice. The clock began running again, and it ran for 30 days until Mr. Conwell filed his second post-conviction petition on January 20, 2017. His second petition was denied on March 15, 2019, and he waited 494 days from that date to file his federal petition.[1] His petition was thus filed well over a year—or approximately 622 days—after his conviction became final.

Although Mr. Conwell filed a "motion to correct errors" in April 2019, this filing would not have tolled the federal deadline under 28 U.S.C. § 2244(d)(2) because it was not a "properly filed application for State post-conviction or other collateral review." *See Martinez v. Jones*, 556 F.3d 637, 638 (7th Cir. 2009); *see also* IND. POST-CONVICTION R. 1(1)(B). He also sought leave to pursue a belated appeal, but the Indiana Court of

---

[1] Respondent counts 503 days, but it appears he did not take into consideration that Mr. Conwell is entitled to application of the prison mailbox rule. *Houston v. Lack*, 487 U.S. 266 (1988). Under that rule, his federal petition was deemed "filed" when he tendered it to prison officials for mailing on July 21, 2020, rather than on July 30, 2020, when it was received by the clerk. This discrepancy is of no significance given that under either analysis, the petition was filed more than a year after his conviction became final.

Appeals declined to permit the untimely appeal. (ECF 10-9 at 1, 3.) Ordinarily, the federal deadline is not tolled during the pendency of a state proceeding that is dismissed as procedurally irregular. *See Fernandez v. Sternes*, 227 F.3d 977, 979 (7th Cir. 2000). But even if the court were to subtract the roughly 127 days his belated appeal was pending from the equation, his federal petition was still filed approximately 500 days after his conviction became final, which is beyond the one-year deadline.

When asked to explain why his petition was timely filed, Mr. Conwell stated as follows: "Because I still have months left to file my federal habeas corpus after I exhausted all my appeal processes, I'm in compliance with the 'AEDPA.'" (ECF 1 at 5.) He appears to believe he had one year from the date all his filings were resolved in state court to seek federal habeas relief, but that is not accurate. *See* 28 U.S.C. § 2244(d). It appears that he simply miscalculated the federal deadline. He does not argue, nor does the court find a basis in the record to conclude, that his claim is based on newly discovered facts or a new Supreme Court case made retroactive to cases on collateral review. *See* 28 U.S.C. § 2244(d)(1)(C)-(D). He also does not identify any state-created impediment that prevented him from filing his petition on time. *See* 28 U.S.C. § 2244(d)(1)(B). Accordingly, his petition is untimely.

B. Cognizability

Assuming for the sake of argument that Mr. Conwell could overcome the untimeliness bar, the respondent alternatively argues that his claim does not present a cognizable basis for granting federal habeas relief. (ECF 10 at 10-13.)

Mr. Conwell's claim is premised on an alleged Fourth Amendment violation. (ECF 1 at 3.) In *Stone v. Powell*, 428 U.S. 465 (1976), the U.S. Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494. That is because the exclusionary rule, which requires the suppression of evidence obtained in violation of the Fourth Amendment, is not a "personal constitutional right" of the accused; rather, "it is a judicially created means of effectuating the rights secured by the Fourth Amendment." *Brock v. United States*, 573 F.3d 497, 499 (7th Cir. 2009) (internal citation and quotation marks omitted). The exclusionary rule was intended to deter violations of the Fourth Amendment by "removing the incentive to disregard it," but it has attendant costs, since it "deflects the truth-finding process and often frees the guilty." *Stone*, 428 U.S. at 484, 490. Thus, the exclusionary rule "has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Id*. at 486-87 (citation omitted). In habeas proceedings, the "contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." *Id*. at 495.

Therefore, federal habeas courts are barred from considering a Fourth Amendment claim where the petitioner had a "full and fair opportunity" to litigate the claim in state court. *Id.*; *Monroe v. Davis*, 712 F.3d 1106, 1114 (7th Cir. 2013). The Seventh

Circuit has held that "a full and fair opportunity guarantees only the right to present one's case." *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007) (citation and internal quotation marks omitted). In plain terms, "[i]t is the right to have a judge who has not closed his mind to the issues, is not bribed or sleepwalking, and is not in some other obvious way subverting the hearing." *Brock*, 573 F.3d at 501 (citation, internal quotation marks, and alteration omitted). A federal habeas court's task is not to "second-guess the state court on the merits of the petitioner's claim, but rather to assure [itself] that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision." *Monroe*, 712 F.3d at 1114.

Here, the record reflects that Mr. Conwell received a full and fair opportunity to litigate his Fourth Amendment claim in state court. Through his counsel, he filed a motion to suppress prior to trial. The trial court held an evidentiary hearing and heard testimony from several witnesses, including Jazy, Detective Tudor, and the arresting officer. (Appellant's App'x at 362.)[2] Thereafter, the court issued a nine-page order denying the motion, which thoroughly outlined the relevant facts, cited to applicable Fourth Amendment principles, and applied those principles to the facts. (*Id.* at 362-34.) The court first concluded that police had a valid arrest warrant when they entered Jazy's apartment.[3] *Conwell*, 2011 WL 1565909, at *2. The court also determined that

---

[2] This citation is to the paper record referenced in Docket Entry 12.

[3] Mr. Conwell offers his own suppositions about alleged irregularities in the signature on the warrant without any evidentiary support. (*See* ECF 1 at 3.) This falls far short of the clear and convincing evidence needed to rebut the presumption that the state court's factual determinations are correct. 28 U.S.C. § 2254(e)(1).

10

Detective Tudor's statement to the arresting officer that a valid arrest warrant had been issued provided sufficient basis for that officer to make the arrest. *Id.* The court further concluded that even if the warrant was not valid, Jazy consented to the search of her apartment, giving the officers the right to enter. *Id.* Finally, the court determined that under *New York v. Harris*, 495 U.S. 14 (1990), Mr. Conwell's post-arrest statement should not be excluded as "fruit of the poisonous tree" because it was made "outside the premises, while in lawful custody from a probable cause arrest." (Appellant's App'x at 333-34.)

Mr. Conwell has not established that the trial judge "closed his mind to the issues," was "sleepwalking," or in some other obvious way subverted the hearing process. *Brock*, 573 F.3d at 501. To the contrary, the judge appears to have thoroughly considered the issues, and his determinations are in accord with Supreme Court case law.[4] *See generally Harris*, 495 U.S. at 18 (exclusionary rule does not bar state's use of post-arrest statement made by suspect outside his home, even though statement is made after a warrantless entry into suspect's home); *United States v. Hensley*, 469 U.S. 221 (1985) (collective knowledge doctrine permits an officer to arrest a suspect at the direction of another officer, even if the officer himself does not have firsthand knowledge of facts); *United States v. Matlock*, 415 U.S. 164 (1974) (Fourth Amendment is

---

[4] Although Mr. Conwell opted not to raise a Fourth Amendment claim in his direct appeal, *Stone* applies as long as the defendant had a "fair opportunity" to assert his claim in the state proceedings, regardless of whether he actually did so. *Bostick v. Peters*, 3 F.3d 1023, 1027 (7th Cir. 1993) ("Of course, the petitioner is not denied an opportunity for full and fair litigation of his claim if he fails to raise and to preserve the claim in state court.").

not violated by warrantless search where consent to enter is obtained from an individual with sufficient relationship to the premises).

It is apparent that Mr. Conwell would like this court to reconsider his arguments in favor of suppression and reach a different conclusion than the trial court did, but that is "a path that *Stone* closes." *Hayes v. Battaglia*, 403 F.3d 935, 939 (7th Cir. 2005). To the extent he is arguing that his arrest or the admission of his post-arrest statement violated Indiana law, the court cannot grant him habeas relief for errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004) (a federal habeas court has no authority to "second-guess state courts in interpreting state law"). Therefore, his claim is not cognizable in this proceeding.

C. Procedural Default

Finally, the respondent argues that even if the petition was timely and could be read to assert a cognizable federal claim that is not barred by *Stone*, the claim is procedurally defaulted because Mr. Conwell did not raise it in one complete round of state review. (ECF 10 at 9-10.)

Before granting relief on the merits, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is premised on a recognition that the state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). For that opportunity to be meaningful, the petitioner must fairly present his constitutional

claim in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004); *Boerckel*, 526 U.S. at 845. This includes seeking discretionary review in the state court of last resort. *Boerckel*, 526 U.S. at 848. The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a claim when: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground; or (2) the claim was not presented to the state courts and the opportunity to do so has now passed. *Davila*, 137 S. Ct. at 2064; *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

The record reflects that Mr. Conwell raised a Fourth Amendment challenge during trial, but he did not raise any such claim to the Indiana Court of Appeals. Rather, he expressly acknowledged in his appellate brief that his post-arrest statement was admissible under a Fourth Amendment analysis, and instead pressed a claim that his arrest and the admission of the statement violated Indiana law. (ECF 10-3 at 10 ("Recognizing that his statement would be admissible under a Fourth Amendment analysis . . . Mr. Conwell proceeds on appeal arguing that the admission of his statement violates the protections afforded by Article I, Section 11 of the Indiana Constitution.").) To properly exhaust a claim under 28 U.S.C. § 2254(b)(1)(A), a habeas petitioner must "present both the operative facts and the legal principles that control each claim" at each level of state review. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). This includes alerting the state court to the "federal nature" of the claim. *Baldwin v. Reese*, 541 U.S. 27, 33 (2004). Mr. Conwell did not do that here and instead expressly

13

waived his Fourth Amendment claim in his brief to the Indiana Court of Appeals. Additionally, his petition to transfer to the Indiana Supreme Court did not include any claim about the suppression of his post-arrest statement and instead focused on another issue. (*See* ECF 10-7 at 3.) He therefore did not present a Fourth Amendment claim in one complete round of state review. *Boerckel*, 526 U.S. at 848. He has not responded to the respondent's procedural default argument or provided grounds for excusing his defaults. For these reasons, the petition must be denied.

D. Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). For the reasons explained above, Mr. Conwell's petition is untimely, and additionally, his claim is barred by *Stone* or procedurally defaulted. The court finds no basis to conclude that reasonable jurists would debate the outcome of the petition or find a reason to encourage Mr. Conwell to proceed further. Accordingly, the court declines to issue him a certificate of appealability.

III.    CONCLUSION

For these reasons, the petition (ECF 1) is DENIED, and the petitioner is DENIED a certificate of appealability. The clerk is DIRECTED to close this case.

SO ORDERED this April 6, 2021.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge
